**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| Charles Nyarko, Lori Evans, Kelly Rutherford, Ronald McKeever, John Michael Albert, Aziz Berraoui, Kathy Swann, Sharon Inghram, Rita Clinton, Laron Morgan, Caroline Chepkwony, Kevan Lee and Kevin Daniels, | :    Civil Action No.: 1:18-cv-03618-RDB |
| Plaintiffs, | : |
| vs. | : |
| BMW of North America, LLC, | : |
| Defendant. | : |

**FIRST AMENDED COMPLAINT**

For this First Amended Complaint, the Plaintiffs[1] Charles Nyarko, Lori Evans, Kelly Rutherford, Ronald McKeever, John Michael Albert, Aziz Berraoui, Kathy Swann, Sharon Inghram, Rita Clinton, Laron Morgan, Caroline Chepkwony, Kevan Lee and Kevin Daniels, by undersigned counsel, state as follows:

**PRELIMINARY STATEMENT**

1.      This is a group action by the purchasers of vehicles (hereafter the "subject vehicles") manufactured and sold by the Defendant BMW of North America, LLC.  Plaintiffs seek damages related to their vehicles' excessive consumption of engine oil and Defendant's failure to honor the terms of its warranty.

2.      The Plaintiffs would not have purchased the subject vehicles had they been made aware of the subject vehicles' defective engines.

---

[1]Additional Plaintiffs may be added at a later date.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this matter pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

4.     In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

5.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendant is subject to personal jurisdiction in this District and Defendant, as principal, directs and controls warranty repairs on covered vehicles through its agents consisting of a dealership network located in this District.

6.     Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiffs' claims occurred within this District.

## PARTIES

7.     Plaintiffs were, at all relevant times, adult individuals who either reside in Maryland or who purchased motor vehicles in Maryland which were manufactured or sold by Defendant.

8.     Defendant BMW of North America, LLC ("BMW-NA" or "BMW") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey.  BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally

manufactured in Munich, Germany.  At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Maryland and throughout the United States.

9.      BMW-NA sells BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA.

**FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS**

**I.    Charles Nyarko**

10.     Plaintiff Charles Nyarko (hereafter "C. Nyarko") is an adult individual residing in Baltimore, Maryland.

11.     On or about March 20, 2015, C. Nyarko purchased a used 2010 BMW 550i Gran Turismo, Vehicle Identification Number WBASN4C56AC209166 (hereafter the "C. Nyarko Vehicle") from Cherner Brothers Auto Sales in Kensington, Maryland.

12.     The total sales price for the C. Nyarko Vehicle was $27,998.00.

13.     Within several months after purchasing the C. Nyarko Vehicle, C. Nyarko observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 1,000 to 1,500 miles, well before the Defendant's recommended oil change intervals.

14.     C. Nyarko complained to BMW of Towson ("Towson") in Towson, Maryland, an authorized dealer of the Defendant, throughout the warranty period that the C. Nyarko Vehicle consumed an excessive amount of engine oil.

15.     Initially, Towson told C. Nyarko "that is just how the engine runs."

16.     After making several more complaints to Towson, C. Nyarko was told the C. Nyarko Vehicle's engine would have to be replaced.

17.     As a result of the C. Nyarko Vehicle's excessive consumption of engine oil, C. Nyarko had to add engine oil to the C. Nyarko Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing and avoid having to change the engine.

18.     Moreover, C. Nyarko has paid approximately $720 in out-of-pocket costs associated with the C. Nyarko Vehicle's excessive engine oil consumption; he continues to incur these costs on a monthly basis.

**II.     Lori Evans**

19.     Plaintiff Lori Evans (hereafter "L. Evans") is an adult individual residing in Pasadena, Maryland.

20.     On or about March 2, 2014, L. Evans purchased a used 2011 BMW 7 Series 750LXi, Vehicle Identification Number WBAKC8C52BC434277 (hereafter the "L. Evans Vehicle") from BMW of Annapolis in Annapolis, Maryland, an authorized dealer of Defendant.

21.     After purchasing the L. Evans Vehicle, L. Evans observed that it consumed an excessive amount of engine oil which required her to add one quart of oil every 300 to 400 miles, well before the Defendant's recommended oil change intervals.

22.     During the warranty period, L. Evans complained to Defendant's authorized dealer that the L. Evans Vehicle consumed an excessive amount of engine oil.

23.     In response, L. Evans was told "it is the 7 series and that's normal."

24.     As a result of the L. Evans Vehicle's excessive consumption of engine oil, L. Evans had to add engine oil to the L. Evans Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

III.    **Kelly Rutherford**

25.     Plaintiff Kelly Rutherford (hereafter "K. Rutherford") is an adult individual residing in Essex, Maryland.

26.     On or about November 16, 2010, K. Rutherford purchased a used 2009 BMW 750Li, Vehicle Identification Number WBAKB83569CY57313 (hereafter the "K. Rutherford Vehicle") from Russell BMW in Baltimore, Maryland, an authorized dealer of Defendant.

27.     The total sale price for the K. Rutherford Vehicle was $94,776.00, including options, fees, taxes, and other charges.

28.     Shortly after purchasing the K. Rutherford Vehicle, K. Rutherford observed that it consumed an excessive amount of engine oil which required her to add one to two quarts of oil every 1,500 miles (and to carry extra oil in the vehicle), well before the Defendant's recommended oil change intervals.

29.     Beginning on December 10, 2010, less than a month after purchasing the K. Rutherford vehicle, Terry Rutherford (hereinafter "Terry"), K. Rutherford's husband and the person primarily responsible for maintaining the vehicle, notified BMW of Catonsville and BMW of Towson, both of which are Defendant's authorized dealerships, that the K. Rutherford Vehicle consumed an excessive amount of engine oil.

30.     In response, Terry was told the oil consumption was normal for the K. Rutherford Vehicle and no repair was ever offered.

31.     Every time Terry took the K. Rutherford Vehicle to one of Defendant's authorized dealers during the warranty period, Terry complained about the oil consumption issue and but was consistently told that the oil consumption was normal and was never offered a repair.

32.     As a result of the K. Rutherford Vehicle's excessive consumption of engine oil, K. Rutherford and Terry had to add engine oil to the K. Rutherford Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

33.     K. Rutherford has paid approximately $7,800 in out-of-pocket costs and repairs associated with the K. Rutherford Vehicle's excessive engine oil consumption.

## IV.     Ronald McKeever

34.     Plaintiff Ronald McKeever (hereafter "R. McKeever") is an adult individual residing in Gwynn Oak, Maryland.

35.     On or about September 22, 2014, R. McKeever purchased a used 2013 BMW 5 Series 550xi, Vehicle Identification Number WBAFU9C52DDY71293 (hereafter the "R. McKeever Vehicle") from Antwerpen Toyota in Clarksville, Maryland.

36.     The total sales price for the R. McKeever Vehicle was $73,556.64, including options, fees, taxes, and other charges.

37.     Within several months after purchasing the R. McKeever Vehicle, R. McKeever observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 1,200 to 1,500 miles, well before the Defendant's recommended oil change intervals.

38.     On December 10, 2014 and during the warranty period, R. McKeever took the R. McKeever Vehicle into BMW of Catonsville in Catonsville, Maryland, an authorized dealer of the Defendant, because the vehicle's "check engine" light was illuminated.  At that time, R. McKeever explained to the dealer that the R. McKeever Vehicle was consuming an excessive amount of engine oil.

6

39.     In response, R. McKeever was told that the oil consumption was due to the model of the vehicle, "that's normal." The dealer went on to tell R. McKeever "if he had bought a more expensive model he wouldn't have an oil consumption problem." No repair was offered.

40.     R. McKeever returned to the dealer several times thereafter with complaints of low oil level.

41.     As a result of the R. McKeever Vehicle's excessive consumption of engine oil, R. McKeever had to add engine oil to the R. McKeever Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

**V.     John Michael Albert**

42.     Plaintiff John Michael Albert (hereafter "J. Albert") is an adult individual residing in Annapolis, Maryland.

43.     On or about December 22, 2012, J. Albert purchased a new 2013 BMW 750Li, Vehicle Identification Number WBAYE8C53DDE22031 (hereafter the "J. Albert Vehicle") from BMW of Alexandria in Alexandria, Virginia, an authorized dealer of Defendant.

44.     The total sales price for the J. Albert Vehicle was $95,534.00, including options, fees, taxes, and other charges.

45.     After purchasing the J. Albert Vehicle and before the first scheduled oil change, J. Albert observed that the vehicle consumed an excessive amount of engine oil which required him to add two quarts of oil every 6,000 to 7,000 miles.

46.     During the warranty period, J. Albert complained to BMW of Annapolis, Maryland, one of Defendant's authorized dealers (before the J. Albert Vehicle's first oil

7

change) and was told that the vehicle's oil consumption was normal.  No repairs for the oil consumption issue were offered by the dealer.

47.     On or about December 9, 2017, Defendant's authorized dealer repaired turbochargers that leaked oil, but J. Albert Vehicle continued to suffer from excessive consumption of engine oil.

48.     As a result of the J. Albert Vehicle's excessive consumption of engine oil, J. Albert had to add engine oil to the J. Albert Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

## VI.     Aziz Berraoui

49.     Plaintiff Aziz Berraoui (hereafter "A. Berraoui") is an adult individual residing in Baldwin, Maryland.

50.     On or about May 20, 2013, A. Berraoui purchased a used 2013 BMW X6, Vehicle Identification Number 5UXFG8C57DL591233 (hereafter the "A. Berraoui Vehicle") from Russell BMW in Baltimore, Maryland, an authorized dealer of Defendant.

51.     The total sales price for the A. Berraoui Vehicle was $80,689.12, including options, fees, taxes, and other charges.

52.     Within the first month after purchasing the A. Berraoui Vehicle, A. Berraoui observed that it consumed an excessive amount of engine oil which required him to add one to two quarts of oil every 500 miles, well before the Defendant's recommended oil change intervals.

53.     At that time and during the warranty period, A. Berraoui notified Defendant's authorized dealer that the A. Berraoui Vehicle consumed an excessive amount of engine oil.

54.     In response, A. Berraoui was told "that's normal, keep adding oil," and accordingly, no repair was offered to A. Berraoui for the vehicle's consumption of engine oil.

55.     As a result of the A. Berraoui Vehicle's excessive consumption of engine oil, A. Berraoui had to add engine oil to the A. Berraoui Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

56.     A. Berraoui has paid approximately $1,475 in out-of-pocket costs and repairs associated with the A. Berraoui Vehicle's excessive engine oil consumption.

## VII.    Kathy Swann

57.     Plaintiff Kathy Swann (hereafter "K. Swann") is an adult individual residing in East New Market, Maryland.

58.     On or about October 10, 2015, K. Swann purchased a certified pre-owned BMW 2012 BMW X5 XDrive 50i, Vehicle Identification Number 5UXZV8C59CL425992 (hereafter the "K. Swann Vehicle") from I.G. Burton BMW in Milford, Delaware, an authorized dealer of Defendant.

59.     The total sales price for the K. Swann Vehicle was $50,325.44, including options, fees, taxes, and other charges.

60.     Within several months after purchasing the K. Swann Vehicle, K. Swann observed that it consumed an excessive amount of engine oil which required her to add one quart of oil every 500 miles (more often less than 500 miles), well before the Defendant's recommended oil change intervals.

61.     On February 9, 2016 and during the warranty period, K. Swann first complained to I.G. Burton BMW, one of Defendant's authorized dealers, that the low oil light

on the K. Swann Vehicle was illuminated and that it consumed an excessive amount of engine oil.

62.     In response, the dealer verified that the low oil light was on because the engine oil level was low.  The dealer topped off the oil to the "proper level," and told K. Swann that with "the type of engine you have, as you get more miles on it, it does this," meaning consume oil.

63.     Other than topping off the K. Swann Vehicle's engine oil, no repair was offered to K. Swann for the vehicle's consumption of engine oil.

64.     As a result of the K. Swann Vehicle's excessive consumption of engine oil, K. Swann had to add engine oil to the K. Swann Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

65.     K. Swann has paid approximately $1,400 in out-of-pocket costs and repairs associated with the K. Swann Vehicle's excessive engine oil consumption.

**VIII.     Sharon Inghram**

66.     Plaintiff Sharon Inghram (hereafter "S. Inghram") is an adult individual residing in Hanover, Maryland.

67.     On or about April 2, 2011, S. Inghram purchased a used 2010 BMW 7 Series 750Li, Vehicle Identification Number WBAKB8C51ACY63119 (hereafter the "S. Inghram Vehicle") from BMW of Fairfax in Fairfax, Virginia, an authorized dealer of Defendant.

68.     The total sales price for the S. Inghram Vehicle was $77,133.59, including options, fees, taxes, and other charges.

69.     Approximately two years after purchasing the S. Inghram Vehicle, S. Inghram observed that it consumed an excessive amount of engine oil which required her to add two

quarts of oil every 1,000 miles, well before the Defendant's recommended oil change intervals.

70.     On October 3, 2013, and during the warranty period, S. Inghram complained to BMW of Catonsville, one of Defendant's authorized dealerships, that the low oil light comes on after driving 15 to 20 miles, usually during highway driving.

71.     In response, the dealer verified that the engine oil level was low and topped off the oil with one quart.  No repair was offered to S. Inghram for her vehicle's oil consumption.

72.     When S. Inghram again complained about the oil consumption issue, she was told by BMW of Catonsville that it was "normal" and the dealer merely offered to top off the oil.  Again, no vehicle repair was offered to S. Inghram for the oil consumption issue.

73.     As a result of the S. Inghram Vehicle's excessive consumption of engine oil, S. Inghram had to add engine oil to the S. Inghram Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

74.     S. Inghram has paid approximately $625 in out-of-pocket costs and repairs associated with the S. Inghram Vehicle's excessive engine oil consumption.

## IX.    Rita Clinton

75.     Plaintiff Rita Clinton (hereafter "R. Clinton") is an adult individual residing in Clinton, Maryland.

76.     On or about May 5, 2012, R. Clinton purchased a new 2012 BMW 7 Series 750LXi, Vehicle Identification Number WBAKC8C52CC437665 (hereafter the "R. Clinton Vehicle") from Passport BMW in Marlow Heights, Maryland, an authorized dealer of Defendant.

77.     The total sales price for the R. Clinton Vehicle was $128,713.40, including options, fees, taxes, and other charges.

78.     Within several months after purchasing the R. Clinton Vehicle, R. Clinton observed that it consumed an excessive amount of engine oil which required her to add one quart of oil every 4,000 miles, well before the Defendant's recommended oil change intervals.

79.     On November 7, 2012, and during the warranty period, Thomas Clinton (hereinafter "Thomas"), R. Clinton's husband and the person primarily responsible for maintaining the vehicle, took the R. Clinton Vehicle to Passport BMW, an authorized dealer of Defendant, and complained that the low oil message was illuminated.  Thomas explained to the dealer that he had topped off the oil but wanted to make sure everything was alright.

80.     In response, the dealer checked the R. Clinton Vehicle's oil level and checked for oil leaks.  The dealer verified to Thomas that the oil level was "ok", no oil leaks were found,  concluded "no problems at this time," and offered no repairs in relation to the vehicle's oil consumption.

81.     During the warranty period, R. Clinton and Thomas complained many times to Defendant's authorized dealer about the vehicle's oil consumption but the dealer did nothing to help fix the problem.

82.     At one point R. Clinton and Thomas complained about the R. Clinton Vehicle emitting smoke and the dealer's manager told R. Clinton "to disregard it until it gets really bad."

83.     As a result of the R. Clinton Vehicle's excessive consumption of engine oil, R. Clinton had to add engine oil to the R. Clinton Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

## X.    Laron Morgan

84.    Plaintiff Laron Morgan (hereafter "L. Morgan") is an adult individual residing in Waldorf, Maryland.

85.    On or about September 14, 2013, L. Morgan purchased a used 2010 BMW 750LXi, Vehicle Identification Number WBAKC8C5XACY68543 (hereafter the "L. Morgan Vehicle") from Mile One Tischer Auto Park in Silver Spring, Maryland.

86.    The total sales price for the L. Morgan Vehicle was $57,247.20, including options, fees, taxes, and other charges.

87.    Shortly after purchasing the L. Morgan Vehicle, L. Morgan observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 200 miles, well before the Defendant's recommended oil change intervals.

88.    During the warranty period and within six months of purchasing the L. Morgan Vehicle, L. Morgan complained to a Defendant's authorized dealership about the subject vehicle's excessive oil consumption.

89.    In response, the dealer told L. Morgan that the oil consumption was normal and offered no repairs in relation to the vehicle's oil consumption.

90.    As a result of the L. Morgan Vehicle's excessive consumption of engine oil, L. Morgan had to add engine oil to the L. Morgan Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

91.    L. Morgan has paid approximately $25,000 in out-of-pocket costs and repairs associated with the L. Morgan Vehicle's excessive engine oil consumption.

### XI.     Caroline Chepkwony

92.     Plaintiff Caroline Chepkwony (hereafter "C. Chepkwony") is an adult individual residing in Silver Spring, Maryland.

93.     On or about November 13, 2010, C. Chepkwony purchased a new 2009 BMW X6 XDrive 50i Vehicle Identification Number 5UXFG83529LZ93555 (hereafter the "C. Chepkwony Vehicle") from BMW of Fairfax in Fairfax, Virginia, an authorized dealer of Defendant.

94.     The total sales price for the C. Chepkwony Vehicle was $61,842.75, including options, fees, taxes, and other charges.

95.     In early 2011, within several months after purchasing the C. Chepkwony Vehicle and during the warranty period, C. Chepkwony and her husband, Moses Omweno (hereinafter "Moses") (the person primarily responsible for maintaining the subject vehicle) observed that it consumed an excessive amount of engine oil which required them to add two quarts of oil every 300 miles, well before the Defendant's recommended oil change intervals.

96.     Moses complained to each of the following authorized dealerships of the Defendant throughout the warranty period that the C. Chepkwony Vehicle consumed an excessive amount of engine oil: Habberstad BMW in Huntington Station, NY, BMW of Rockville in Rockville, MD, BMW of Silver Spring in Silver Spring, MD, Baron BMW in Merriam, KS and Circle Motorsport, Inc. in Eatontown, NJ.

97.     In response, C. Chepkwony and Moses were told their vehicle's excessive oil consumption was "normal for big engines."   Other than replacing a cracked tube that leaked some oil, no repair was offered by any of the authorized dealerships for the vehicle's consumption of engine oil.

98.     As a result of the C. Chepkwony Vehicle's excessive consumption of engine oil, C. Chepkwony and Moses had to add engine oil to the C. Chepkwony Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

99.     C. Chepkwony has paid approximately $34,722.77 in out-of-pocket costs and repairs associated with the C. Chepkwony Vehicle's excessive engine oil consumption.

**XII.    Kevan Lee**

100.    Plaintiff Kevan Lee (hereafter "K. Lee") is an adult individual residing in Great Mills, Maryland.

101.    On or about July 29, 2014, K. Lee purchased a used 2012 BMW 750LXi Vehicle Identification Number WBAKC8C50CC435025 (hereafter the "K. Lee Vehicle") from Passport BMW in Marlow Heights, Maryland, an authorized dealer of Defendant.

102.    The total sales price for the K. Lee Vehicle was $67,673.60, , including options, fees, taxes, and other charges.

103.    In early 2015, and during the warranty period, K. Lee observed that the K. Lee Vehicle consumed an excessive amount of engine oil which required him to add one to two quarts of oil every 8,000 to 12,000 miles, before the Defendant's recommended oil change intervals.

104.    K. Lee complained to BMW of Annapolis, an authorized dealer of the Defendant, during the warranty period that the K. Lee Vehicle consumed an excessive amount of engine oil.

105.    In response, K. Lee was told "that car normally burns one quart of oil a year," and accordingly; no repair was offered for the vehicle's consumption of engine oil.

106.     On or about January 18, 2017, in response to K. Lee's complaint to BMW of Catonsville that his vehicle continues to consume an excessive amount of engine oil, the dealer replaced valve seals but charged an extended warranty company and K. Lee for the repair.

107.     As a result of the K. Lee Vehicle's excessive consumption of engine oil, K. Lee had to add engine oil to the K. Lee Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

108.     K. Lee has paid approximately $2,000 in out-of-pocket costs and repairs associated with the K. Lee Vehicle's excessive engine oil consumption.

**XIII.    Kevin Daniels**

109.     Plaintiff Kevin Daniels (hereafter "K. Daniels") is an adult individual residing in Oxon Hill, Maryland.

110.     On or about February 29, 2012, K. Daniels purchased a used 2009 BMW 750Li Vehicle Identification Number WBAKB83529CY59589 (hereafter the "K. Daniels Vehicle") from BMW of Alexandria in Alexandria, Virginia, an authorized dealer of Defendant.

111.     The total sales price for the K. Daniels Vehicle was $95,327.28, including options, fees, taxes, and other charges.

112.     Within two months after purchasing the K. Daniels Vehicle, K. Daniels observed that the vehicle consumed an excessive amount of engine oil which required him to add several quarts of oil every 200 to 300 miles, well before the Defendant's recommended oil change intervals.  K. Daniels also noticed smoke coming out of the vehicle's exhaust pipe.

113.     During the warranty period, K. Daniels complained to BMW of Alexandria, an authorized dealer of the Defendant, that the K. Daniels Vehicle consumed an excessive amount of engine oil.

114.     In response, K. Daniels was told that the K. Daniels Vehicle has "a big engine, you have to feed it oil," and accordingly, no repair was offered for the vehicle's consumption of engine oil and the subject vehicle continued to burn an excessive amount of engine oil and emit smoke from its exhaust pipe.

115.     In or around August and September 2017, K. Daniels took the subject vehicle in to BMW of Alexandria again complaining that smoke was coming out of the K. Daniels Vehicle's exhaust pipe when sitting in idle.  Upon inspection a "substantial oil leak was found coming from the engine's bottom end or rear end covers," and further investigation was needed to determine the true source of the leak.

116.     The oil leak was not fixed and the K. Daniels Vehicle continues to consume an excessive amount of engine oil which requires D. Daniels to add five quarts of oil every 200 miles.

117.     As a result of the K. Daniels Vehicle's excessive consumption of engine oil, K. Daniels had and continues to add engine oil to the K. Daniels Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

118.     K. Daniels has paid approximately $500 in out-of-pocket costs and repairs associated with the K. Daniels Vehicle's excessive engine oil consumption.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

119.   Defendant manufactured and placed into the stream of commerce each of the aforementioned vehicles (the subject vehicles), which the Plaintiffs subsequently purchased.

120.   At the time Plaintiffs purchased the subject vehicles, Defendant made representations as to the subject vehicles' performance and quality and assured the Plaintiffs that the subject vehicles were free from defects of workmanship.

121.   Prior to purchasing their vehicles, all Plaintiffs relied upon Defendant's representations regarding Defendant's New Vehicle Limited Warranty that accompanied the sale of their vehicles, including the representation that Defendant would repair their vehicles' engines; these representations were material to Plaintiffs' decision to purchase their vehicles.

122.   Specifically, under its New Vehicle Limited Warranty, Defendant promised to repair or replace components found to be defective in material or workmanship during the 4-year / 50,000-mile following such vehicle delivery to consumer.

123.   Defendant's authorized dealers expressly assented to perform warranty repairs on the subject vehicles, necessary to bring Defendant in compliance with the Defendant's express warranty.

124.   Defendant controls the execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that the warranty repairs be performed in strict accordance with its repair guidelines, Technical Service Bulletins, and other instructions.

125.   In return, Defendant pays its authorized dealerships monetary compensation for such warranty repairs.

18

126.    Therefore, Defendant's authorized dealers are agents for purpose of vehicle repairs, and knowledge of a defect reported to any such dealer can be imputed to Defendant.

127.    After purchasing their vehicles, Plaintiffs discovered that, unbeknownst to them, the subject vehicles' engines contain a manufacturing defect which causes each of the subject vehicles to consume engine oil at an extremely rapid rate.

128.    Moreover, Plaintiffs discovered that as a result of the subject vehicles' above-described defect, Plaintiffs were required to regularly add additional engine oil to their vehicles in between the Defendant's recommended oil change intervals in order to prevent their vehicles' engines from failing and suffering from other related damage.

129.    In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

130.    Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

131.    The subject vehicles are all equipped with the N63 engine.

132.    The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63

engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

133.    Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

134.    N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

135.    The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (*See* http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm (last visited Feb. 5, 2019)).

136.    The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

137.    The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

20

138.   Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature accompanying the sale of the vehicle – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

139.   For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2000 miles.  I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue?  Oh btw the car has 9120 miles and I put 3100 in Europe during my ED.  When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(*See* http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Feb. 5, 2019)).

140.   A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

141.   An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[2]

142.   BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines,

---

[2] *See, e.g.*, http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Feb. 5, 2019); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Feb. 5, 2019).

not known or reasonably discoverable by consumers. Defendant, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

143.    The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[3]

144.    With regard to the oil consumption issue, BMW issued the following TSBs:

> NHTSA ID Number: 10046859
> Service Bulletin Number: SIB-11-08-12
> Summary: DUE TO DAMAGED SEAL RING, DURING
> ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL
> PUMP VOLUME CONTROL VALVE GASKET SEAL RING.
> MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL
> YEARS LISTED.
> _____
> NHTSA ID Number: 10045282
> Service Bulletin Number: SIB-11-07-12
> Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
> WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
> SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS
> CONSUMED ABOVE SPECIFICATIONS.

145.    In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil. (*See* http://www.xbimmers.com/forums/showthread.php?p=14449679 (last visited Feb. 5, 2019)).

146.    Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two

_____

[3] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

quarts of engine oil when the vehicles electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

147.    Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

> Service Bulletin Number: SIB-11-03-13
>
> Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.
>
> Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.
>
> Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.
>
> All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a

turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:

- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.

- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.

Turbocharged Engines:

Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

148.    BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize its own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs, Defendant continued to misrepresent to its customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

149.    BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

24

150.     Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

151.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not*.  (*See* http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm (last visited Feb. 5, 2019)).

152.     Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

153.     The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

154.     Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced

the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

155.    BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

156.    BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

157.    Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

158.    As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

159.    The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in

operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiffs, their passengers, and others who share the road with them to serious risk of accidents and injury.

160.    Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiffs, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendant and its dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

161.    Defendant had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiffs because the defect poses an unreasonable safety hazard, and because Defendant had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by the Plaintiffs. Defendant, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

162.    An engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for each Plaintiff an unreasonably dangerous circumstance that may result in a crash.

163.    The oil consumption defect can be and has been enormously consequential to Plaintiffs, burdening them with out-of-pocket expenses that would not be necessary but for such defect and depriving them of their original bargains.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the

27

recently decreased oil change intervals, which the Plaintiffs specifically sought to avoid by purchasing high-end BMW vehicles. Second, the oil consumption defect means that Plaintiffs must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiffs continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages Plaintiffs from traveling long distances in their N63 vehicles or forces them to carry an extra supply of oil.  Third, Plaintiffs will suffer significant loss when they sell the subject vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

164.    Plaintiffs each provided Defendant or one or more of its authorized dealers with an opportunity to repair the problems with the subject vehicles. Defendant has neglected, failed, refused or otherwise been unable to repair the substantial impairments to the subject vehicles within a reasonable amount of time or a reasonable number of attempts.

165.    The oil consumption defect experienced by the Plaintiffs substantially impairs the use, value and safety of the subject vehicles to the Plaintiffs.

166.    The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the vehicles.

167.    The Plaintiffs would not have purchased the subject vehicles had they known, prior to the respective times of purchase, that they would be required to regularly purchase and add large volumes of engine oil to the subject vehicles in order to prevent the subject vehicles' engines from failing.

## TOLLING OF STATUTE OF LIMITATIONS

**I.    Fraudulent Concealment Tolling**

168.    Plaintiffs did not and could not have known that there was an oil consumption defect with the subject vehicles' respective engines at the time that they purchased the subject vehicles or any time thereafter.

169.    The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiffs' claims, should be tolled because of Defendant's knowing and active concealment of the fact that the subject vehicles' engines contain a defect.

170.    Defendant had a duty to disclose the oil consumption defect in the Plaintiffs' vehicles and had a duty to warn the Plaintiffs, who will foreseeably drive their vehicles, of those dangers, as an engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for each Plaintiff an unreasonably dangerous circumstance that may result in a crash.

171.    While Defendant issued TSB's making clear it was aware that there was a defect with the subject vehicles' engines, Defendant failed to disclose the existence of the defect to Plaintiffs at the time of the subject vehicles sale and at the time Plaintiffs presented their vehicles to Defendant's authorized dealer for repairs.

172.    Moreover, Defendant's authorized dealerships informed all of the Plaintiffs that the subject vehicles' excessive consumption of engine oil was normal, rather than the result of a defect.

173.    Defendant kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.

174.    Defendant knowingly, affirmatively, and actively concealed the subject vehicles' defect from the Plaintiffs.

175.    Defendant was aware of the defect with the subject vehicles.

176.    Based upon the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## II.    Discovery Rule Tolling

177.    Plaintiffs could not have discovered through the exercise of reasonable diligence that their vehicles contained the oil consumption defect within the time period of any applicable statutes of limitation.

178.    Plaintiffs did not know the engines in their respective vehicles were defective when they purchased their vehicles.  Plaintiffs did not and could not have known that the SIB-11-01-13 and the N63 Customer Care Package campaigns did not cure the oil consumption defect and left the subject vehicles engines vulnerable to catastrophic failure in the course of their normal operation.

179.    Although Defendant launched the SIB-11-01-13 and the N63 Customer Care Package campaigns for the subject vehicles, the campaigns were limited in scope, and consumers were not informed that that the campaigns would not cure the oil consumption defect and remove the risk of the subject vehicles engines vulnerable to catastrophic failure in the course of their normal operation.

## III.    Estoppel

180.    Defendant was under a continuous duty to disclose to the Plaintiffs the true character, quality, and nature of the subject vehicles.

181.    Defendant knowingly, affirmatively, and actively concealed the true nature, quality, and character of the subject vehicles from Plaintiffs, and Defendant never intended to repair the oil consumption defect in the subject vehicles.

182.    Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

### IV.    Class Action Tolling

183.    The statutes of limitation applicable to Plaintiffs' claims – including, without limitation, their breach of express warranty and implied warranty claims – have additionally been tolled by class action tolling in light of the Bang v. BMW of North America, LLC (Case No. 2:15-CV-6945) Complaint, filed September 18, 2015, and the Second Amended Complaint, filed in that case on March 21, 2016, (attached hereto as Exhibit A). *See, e.g., Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 839 (D. Md. 2013) (applying class action tolling and noting that the "Maryland Court of Appeals has adopted American Pipe and its progeny.").

### FIRST CAUSE OF ACTION
### Breach of Warranty Pursuant to the Magnuson-Moss
### Warranty Act, 15 U.S.C. §2301, *et seq.*

184.    The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

185.    The Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

186.    Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

187.    The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

188.    15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect, malfunction or nonconformance of the subject vehicles within a reasonable time and without charge to the Plaintiffs.

189.     Despite repeated demands, Defendant has failed to remedy the subject vehicles' oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

190.     As a result of Defendant's breaches of written and implied warranties, and Defendant's failure to remedy the same within a reasonable time and without charge to Plaintiffs, Plaintiffs have suffered damages.

## SECOND CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. §2301, *et seq.* and MD Code, Commercial Law, § 2-314**

191.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

192.     Defendant is a merchant with respect to motor vehicles.

193.     The subject vehicles were each subject to implied warranties of merchantability, as defined in 15 U.S.C.  § 2308 and MD Code, Commercial Law, § 2-314, running from the Defendant to the Plaintiffs.

194.     An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

195.     Defendant breached the implied warranty of merchantability in that the subject vehicles were not in merchantable condition when the Plaintiffs purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

196.     Indeed, the subject vehicles each suffered from an oil consumption defect, which is a significant safety concern in that it prevents the subject vehicles' engines from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot

be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the subject vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

197.    Plaintiffs notified Defendant of the defects in the subject vehicles within a reasonable time after Plaintiffs discovered them.

198.    As a result of Defendant's breaches of the implied warranty of merchantability, Plaintiffs have suffered damages, including but not limited to incidental and consequential damages.

### **THIRD CAUSE OF ACTION**
**Breach of Express Warranty Pursuant to the MD Code, Commercial Law, § 2-313**

199.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

200.    In connection with the sale of the subject vehicles to the Plaintiffs, Defendant provided the Plaintiffs with a New Vehicle Limited Warranty and Certified Pre-Owned Warranty, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

201.    Plaintiffs relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

202.    Plaintiffs submitted their vehicles for warranty repairs as referenced herein. Defendant failed to comply with the terms of the express written warranty provided to each

Plaintiff, by failing and/or refusing to repair the oil consumption defect under the vehicles' warranty as described herein.

203.    Plaintiffs have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable to and/or has refused to do so within a reasonable time.

204.    As a result of said nonconformities, Plaintiffs cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

205.    The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the subject vehicles.

206.    The Plaintiffs would not have purchased or leased the subject vehicles, or would have paid less for the subject vehicles, had they known, prior to their respective time of purchase or lease, that the subject vehicles contained the oil consumption defect.

207.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiffs have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the subject vehicles containing the defects identified herein.

**FOURTH CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices**
**MD Code, Commercial Law, § 13-301, *et seq.***

208.    The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

209.    The sale of the subject vehicles to the Plaintiffs under the guise that they were free from defects that would substantially impair the use, safety, or value of the subject vehicles represents an unlawful or deceptive trade practice under MD Code, Commercial Law, § 13-301, et seq.

34

210.    In the course of Defendant's business, it willfully failed to disclose and actively concealed that the subject vehicles are defective. The existence of the defect, which manifests in all or substantially all of the subject vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, requires expensive and inconvenient maintenance efforts, and causes the subject vehicles to be worth substantially less than they would otherwise be valued. Defendant's failure to disclose the defects and their ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers. Defendant also made affirmative misstatements, as set forth above.

211.    Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that subject vehicles have characteristics, uses, benefits, and qualities which they do not have and otherwise engaging in conduct likely to deceive.

212.    Specifically, and as alleged above, Defendant knew or should have known that the twin-turbo charged engine had one or more defects that causes the subject vehicles to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil. The oil consumption defect decreases the lubrication available to engine parts, which results in premature failure. As a consequence, the oil consumption defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.

213.    The oil consumption defect also is a significant safety concern in that it prevents the subject vehicles' engines from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.

Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the subject vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

214.    Defendant acquired knowledge of the oil consumption defect prior to Plaintiffs acquiring the subject vehicles, through sources not available to consumers such as Plaintiffs, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to Defendant and its network of dealers, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to these complaints, as well as warranty repair and parts replacement data received by Defendant from Defendant's network of dealers, amongst other sources of internal information.

215.    While Defendant knew about the oil consumption defect, and its safety risks since mid-2008, if not before, Defendant nevertheless concealed and failed to disclose the defective nature of the subject vehicles and their engines to Plaintiffs at the time of purchase and thereafter.

216.    By failing to disclose and concealing the defective nature of the N63 engine from Plaintiffs, Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law as they represented that the subject vehicles and their engines had characteristics and benefits that they do not have, and represented that the subject vehicles and their engines were of a particular standard, quality, or grade when they were of another.

217.    The facts concealed or not disclosed by Defendant to Plaintiffs are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the subject vehicles.

218.    Had Plaintiffs known that the subject vehicles and their engine were defective at the time of purchase, they would not have purchased the subject vehicles.

219.    In addition, the Defendant's failure and refusal to repair the subject vehicles is likewise an unfair and deceptive practice.

220.    Further, the Defendant violated MD Code, Commercial Law, § 13-301, et seq., in one or more of the following ways:

a.   Making of fraudulent and/or negligent representations, as herein before alleged;

b.   Representing the subject vehicles to be of good, merchantable quality, free of defects, when in fact they were not;

c.   Failing to reveal material facts including, but not limited to, the nature of the nonconformities and defects complained of herein.

221.    The Defendant is in the business of selling private automobiles and therefore the violations are likely to affect the general public, now and in the future.

222.    The Defendant violated the law willfully and knowingly.

**<u>DEMAND FOR RELIEF</u>**

WHEREFORE, the Plaintiffs demand judgment against Defendant as follows:

a.   An order approving revocation of acceptance of the subject vehicles;

b.   Money damages, in the form of a refund of the full contract prices,

including, trade-in allowance, taxes, fees, insurance premiums, interest, and

costs, and a refund of all payments made by Plaintiffs on the subject

contracts;

37

c.  Equitable relief including, but not limited to, replacement of the subject

vehicles with new vehicles, or repair of the defective subject vehicles with

an extension of the express and implied warranties, and service contracts

which are or were applicable to the subject vehicles, in the event that

Plaintiffs are not found to be entitled to revocation;

d.  Incidental and consequential damages;

e.  Treble and punitive damages;

f.  Reasonable attorney's fees;

g.  Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: February 13, 2019

Respectfully submitted,

By:   */s/ Sergei Lemberg*
Sergei Lemberg, Esq.
LEMBERG LAW, L.L.C.
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile:  (203) 653-3424
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**THIS IS TO CERTIFY** that on February 13, 2019, a true and correct copy of the

foregoing First Amended Complaint was filed electronically with the U.S. District Court ECF

system and that the copy of such filing was served upon the attorney of record for each other

party using the Court's CM/ECF system.


By */s/ Sergei Lemberg*
Sergei Lemberg